POKORNY ET AL. *v.* PECSOK ET AL., APPELLANTS.

(Nos. 76-1102 and 76-1124—Decided June 22, 1977.)

Messrs. *Gallagher, Sharp, Fulton, Norman & Mollison* and Mr. *Robert W. Sharp,* for appellant Texaco, Inc.

Messrs. *Arter & Hadden* and Mr. *Thomas V. Koykka,* for appellant William B. Pecsok.

*Per Curiam.* Appellant Pecsok contends that a lessee remains bound by its lease if it fails to meet the conditions for cancellation specified therein. Therefore, when Texaco dismantled its service station and removed the marketing equipment, it rendered itself incapable of complying with a condition of cancellation in the lease that the lessee surrender to the lessor all of the former's improvements and equipment.

Clause six of the instant lease provides in relevant part:

"Should * * * [the] premises or a part thereof sufficient in lessee's judgment to render the remainder unsuitable for [a] gasoline service station, be taken or condemned for public use, then lessee may cancel and terminate this lease upon giving lessor thirty (30) days written notice, and in that event, lessee shall accept as compensation for its interest out of any settlement or award to be made an amount equal to its unamortized book value of all its improvements and equipment on the premises."

Because Clause six, in the course of its discussion of

termination of the lease, makes reference to "all its improvements and equipment on the premises" relative to the lessee, Pecsok believes that the delivery of all these improvements and equipment from the lessee to the lessor is a condition upon cancellation itself. There having been no such delivery of these materials in their entirety, Pecsok argues that there could have been no cancellation consistent with the lease.

However, we note that reference within the lease to the improvements and equipment relates to compensation being made the lessee. The discussion of compensation to the lessee in Clause six is introduced by the phrase "in that event." Reading that phrase in context, it is clear that the "event" upon which compensation hinges is cancellation itself. Within the scope of Clause six, the compensation and delivery is not a condition upon cancellation.

The phrasing "and in that event [*i. e.*, termination] lessee shall accept as compensation for its interest out of any settlement or award to be made an amount equal to its unamortized book value of all its improvements and equipment on the premises" obviously assumes the event of termination. Clause six imposes no such condition upon that anticipated termination.

Pecsok avers further that under a lease providing for cancellation upon stated conditions, a lessor may reject a cancellation notice purportedly given in lessee's name by an agent theretofore unknown to the lessor, absent proof demanded by the lessor of the agent's authority. Pecsok suggests that the instant lessee never properly canceled its lease because a letter purportedly constituting the cancellation contained no proof that the Texaco agent signing the letter was authorized to cancel the lease.

We have examined the letter in question, and note that the signatory thereto is identified plainly upon Texaco stationery as the lessee's "Regional Manager, Chicago Division." Managerial employees generally enjoy especially broad powers for the liberal exercise of judgment in those dealings which relate to the enterprise under their

care.[1] We disagree that a power of attorney or some other document of authority needed to be included with the letter of cancellation.

Pecsok submits finally that when Texaco tendered a rent payment for a subsequent period, which he accepted after his rejection of Texaco's cancellation, he was entitled to treat the payment as acquiescence in his rejection of the cancellation.

We do not quarrel with Pecsok's assertion that one deliberately abandoning a right cannot reclaim it against the will of his adversary.[2] However, the record shows that the rental check in question was mailed erroneously, due only to slow internal communication within Texaco. Although the notice of lease termination discussed above was mailed, apparently, from Chicago, the rental check was mailed from Atlanta. Additionally, it is undisputed that Texaco successfully stopped payment on the check.

One party cannot bind another when it is obvious that what otherwise would seem a rights waiver is actually a misunderstanding or was unintentional.[3] The conduct of

---

[1] The powers of an agent are particularly broad in the case of one acting as a manager; such a position presupposes a degree of confidence reposed and investiture with liberal powers for the exercise of judgment and discretion in transactions and concerns which are incidental or appurtenant to the business entrusted to his care and management. *Ackerson* v. *Erwin M. Jennings Co.* (1928), 107 Conn. 393, 397, 140 A. 760.

[2] Ordinarily, a waiver operates to preclude a subsequent assertion of the right waived or any claim based thereon. One who intentionally relinquishes a known right cannot, without consent of his adversary, reclaim it, for it is well settled that a waiver once made is irrevocable, even in the absence of consideration, or of any change in position of the party in whose favor the waiver operates. And once a right is waived, the waiver cannot be withdrawn without the consent of the other party, even if subsequent events proved the right waived to have been more valuable than was anticipated. *Jenkins* v. *Indemnity Ins. Co.* (1964), 152 Conn. 249, 258, 205 A. 2d 780.

[3] "If the receiver of * * * [a] telegram ought to have known that there must have been a mistake in the wording of the telegram, from his knowledge of the market, or for other reasons, he cannot under any

Texaco did not suffice to waive the cancellation of its lease.

Appellant Texaco submits that the lease does not foreclose it from, if a partial appropriation of the leasehold renders the remainder unsuitable for the leased purposes, cancelling the lease and accepting as compensation from any settlement the sum equaling lessee's unamortized book value of its improvements and equipment left by it upon the premises. It argues that this is so, regardless of whether the improvements and equipment remaining on the leasehold at termination are of any actual value to the lessor. In support of this position, Texaco emphasizes its belief that Clause six becomes operative only if, after the appropriation, the remainder of the leasehold is unfit for use as a service station and that it has so decided. However, circumstances which Texaco has found unsuitable for running a service station nevertheless appear satisfactory for Pecsok, and there is testimony in the record to the effect that Clause six was drafted so as to enable him to carry on the service station business after Texaco's departure. Utilization within this lease of such terminology as "all its improvements and equipment" signals the anticipation that Texaco would surrender its equipment in such a fashion as to allow Pecsok to attempt to continue operating the service station himself. It embraces no authorization for Texaco to strip assets from the leasehold and then demand compensation for whatever was left, at a rate irrespective of the actual value to the lessor.

Texaco proposes that when separate clauses of a lease provide (1) that buildings and equipment placed on the leasehold by the lessee shall be its property and removable

view by accepting bind the offeror. And the same principle is applicable in any case where the offeree should know that the terms of the offer are unintended or misunderstood by the offeror. The offeree will not be permitted to snap up an offer that is too good to be true; no agreement based on such an offer can then be enforced by the acceptor." 1 Williston on Contracts 343 (3 Ed.), Acceptance of Offers, Section 94 (1957).

by it during the lease or at its termination "as herein provided or otherwise," and (2) that upon an appropriation of a part of the leasehold rendering the remainder unsuitable for the purpose of the lease, the lessee may terminate the lease and shall accept as compensation from any settlement a sum equal to the unamortized book value of "all its improvements and equipment on the premises," the effect of the latter clause is to determine the amount of the lessee's share of the award, and prior to termination of the lease the lessee may remove the improvements and equipment it wishes, being compensated for those remaining.

Clause four of the lease provides:

"All buildings, improvements, fixtures, equipment, and other property owned by the lessee, or erected or placed on said premises by lessee during the term of this lease, or any extension or renewal thereof, shall be the property of and belong exclusively to the lessee, free from any liens or encumbrances. It is understood that the lessee has the right to remove or replace buildings, fixtures, aboveground equipment, underground tanks and other removable property at any time during the term of this lease at its sole discretion, and that upon the termination of this lease as herein provided or otherwise, the lessee shall have the right to sever and remove from said premises all buildings, improvements, fixtures, equipment and other property owned by the lessee or erected or placed upon said premises by the lessee. It is understood, however, that the lessee is under no obligation to remove the same or any part thereof, but that in the event of lessee's failure to do so within thirty (30) days after the date of the termination of this lease, such buildings and improvements not removed from said premises shall become the sole property of the lessor."

Clause four (entitled "Ownership and Removal of Buildings and Property") allows Texaco to remove assets but not to be compensated for those left behind. Clause six (entitled "Condemnation") affords Texaco compensation for its assets, but no authority to remove them. It is plain

that the two clauses cannot be used jointly. Texaco was empowered to perform pursuant to either Clause four or Clause six, but not both. Because Texaco, under the authority of Clause four, dismantled the station and removed all of the marketing equipment, we conclude that it disabled itself from seeking compensation under Clause six.

Texaco asserts that when there are several interests in a parcel of appropriated real estate, the value of each is fixed by determining the value of the property as a whole, with an apportionment of the award among the owners according to their respective interests. However correct this general proposition of law may be, Clause six of the instant contract renders it inapplicable to the case at bar. See *Carroll Weir Funeral Home* v. *Miller* (1965), 2 Ohio St. 2d 189, 191, 207 N. E. 2d 747.

The judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., HERBERT, W. BROWN, P. BROWN, SWEENEY and LOCHER, JJ., concur.

CELEBREZZE, J., concurring in part and dissenting in part.

Because I agree that Texaco validly cancelled its lease, I concur with the majority decision to affirm the Court of Appeals' judgment in case No. 76-1102. I must, however, dissent from the affirmance of case No. 76-1124.

In ruling on Texaco's appeal the majority has failed to cite any case or textbook authority for their precipitous conclusion that "[i]t is plain that the two clauses cannot be used jointly." Rather, it is remarked that "there is testimony in the record to the effect that Clause six was drafted so as to enable * * * [Pecsok] to carry on the service station business after Texaco's departure." By this reference to the transcript the majority indicates that it was persuaded by Pecsok's patently self-serving interpretation of certain language in the lease. According to

Pecsok, Clause 6 required that before Texaco could share in the appropriation award it must first surrender its service station *in toto*—"they would walk off, they would turn over the keys and I would have my man or a new lessee continue with the operation of it as a service station."

In my view, it was error to accord such great weight to Pecsok's subjective view of the lease provisions. Certainly that which a draftsman of an instrument would prefer to have said, or what he thought the instrument provided for, should not be controlling. It is an elementary principle of contract law that the intention of a party that is relevant is the intention manifested by him, rather than any different undisclosed intention. This is so since the expectation and understanding of the other party must also be taken into account.

"It is generally said that the purpose of interpretation is to become aware of the 'intention of the parties.' * * * In contracts * * *there are always at least two parties whose intention and understanding must be considered. A contractor whose expressions induce another to understand and to act in reliance on that understanding may be held responsible therefor. In most cases * * * [judges] are more interested in the understanding that is induced than in the meaning that the contractor himself had and intended to convey to the other. This has led very thoughtful and learned judges to say that the intention of the contractor is immaterial and that evidence of his intention—even his own testimony under oath as to what his intention was—will not be received. The other party cannot know what his intention was except so far as he expressed it in a manner understandable by others. Therefore, he can not hold the other party bound in accordance with a meaning unless (1) the other party so understood his expressions, or (2) had reason so to understand them under the existing circumstances (meaning by this that any other understanding would be unreasonable)." 3 Corbin on Contracts, Section 538.

The American Law Institute, through the compilation

of the Restatement of Contracts 2d, has attempted to aid the courts in the ascertainment of meaning in interpretation of agreements. Section 229 of the Restatement of Contracts 2d (Tent. Drafts Nos. 1-7 [1973]), provides the following standards of preference in interpretation:

"In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable:

"(a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect;

"(b) express terms are given greater weight than course of performance, course of dealing, and usage of trade, course of performance is given greater weight than course of dealing or usage of trade, and course of dealing is given greater weight than usage of trade;

"(c) specific terms and exact terms are given greater weight than general language;

"(d) separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated."

It can be seen that the majority interpretation, by giving effect to Pecsok's subjective intentions, ignores the general principles set out above. Without stating any reasons whatsoever, the majority holds Clauses 4 and 6 to be mutually exclusive, thereby causing a part of the agreement to be ineffective. Rather than give the specific, separately added condemnation provision (Clause 6) greater weight, the majority somehow concludes that Texaco "disabled itself" from seeking compensation under the condemnation clause at precisely the time when it would seem that this specific provision becomes applicable.

Clauses 4 and 6 may quite reasonably be read together, so as to give a lawful and effective meaning to all the terms of the agreement. Under normal circumstances, Texaco would have the right to remove buildings, fixtures, above-ground equipment, underground tanks and other re-

movable property at any time during the term of the lease. Any property not so removed within 30 days after termination of the lease would become the property of Pecsok. However, should a part of the premises be condemned for public use, sufficient in Texaco's judgment to render the remainder unsuitable, Texaco may terminate the lease. In that event [termination due to condemnation] the lease provides that "lessee shall accept as compensation for its interest out of any settlement or award to be made an amount equal to its unamortized book value of *all its improvements and equipment* ON THE PREMISES." (Emphasis added.)

Obviously, that property which Texaco chose to remove prior to the cancellation of the lease is no longer *on the premises*. Pursuant to the unambiguous wording of Clause 6, Texaco is entitled to receive, as its share of condemnation award, the unamortized book value of the improvements remaining on the premises, *i. e.*, the service station building itself, the underground tanks, and the asphalt and concrete paving.

I will not expound at length upon the many ludicrous implications of the majority's interpretation. Suffice to say that it would be most unlikely for the parties to intend upon the continued operation of a service station which is, by the terms of the same lease clause, "unsuitable" for operation. Further, it defies logic to imply that the lessor's appropriation award should be reduced by the value of removable property (which presumably would not, in any real sense, be "taken" in an appropriation) or, conversely, that the lessee should receive an award for its salvageable property.

For the foregoing reasons, I dissent from the judgment in case No. 76-1124.